# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JOHN HEARD,**

      **Plaintiff,**

v.                                      **No. 15-cv-0516 MCA/SMV**

**GREGG MARCANTEL,
JAMES FRAWNER, and
MTC CORPORATION,**

      **Defendants.**

### MAGISTRATE JUDGE'S
### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before me on Defendant Management & Training Corporation ("MTC") and Defendant Frawner's (collectively, "MTC Defendants'") Motion for Summary Judgment [Doc. 39], filed April 25, 2016, and Defendant Marcantel's *Martinez* Report [Doc. 42], filed May 9, 2016, which I construe as a motion for summary judgment (collectively, "Motions").[1]  Plaintiff, who is incarcerated, appearing pro se, and proceeding *in forma pauperis*, did not respond to MTC Defendants' motion; instead, on May 26, 2016, Plaintiff responded to Defendants' *Martinez* reports, *see* [Doc. 45], and filed several additional supporting documents.[2] MTC Defendants filed a reply in support of their motion [Doc. 61] and a reply in support of their *Martinez* report [Doc. 62] on July 8, 2016.  Defendant Marcantel filed a reply in support of his *Martinez* report on July 15, 2016.  [Doc. 64].  In the time since Defendants filed their Motions,

---

[1] Also pending before me are Plaintiff's Motion to Amend Complaint [Doc. 43], which I decline at this time to rule on, and Plaintiff's Motion to Stay Summary Judgment [Doc. 44], which is addressed in a separate order filed herewith.
[2] *See* "Memorandum of Law" [Doc. 46], "Affidavit" [Doc. 47], "Affidavit for Plaintiff's Position on Count 1" [Doc. 48], "Second Affidavit" [Doc. 49], and "Statement in Support of Plaintiff's Position for Count 2" [Doc. 50].

Plaintiff has submitted numerous other filings supporting his positions and raising additional claims.[3]  Defendants have responded to Plaintiff's filings.[4]

This matter was referred to me for analysis and a recommended disposition on June 24, 2015, by the Honorable M. Christina Armijo, Chief United States District Judge. [Doc. 4].  Having reviewed the pertinent filings and relevant law, and being otherwise fully advised in the premises, I find that Defendants' Motions should be GRANTED IN PART and DENIED IN PART.  Defendants' Motions should be GRANTED as to Plaintiff's claim regarding Defendants' policy prohibiting the receipt through the mail of publications containing photographs of female(s) partially or totally nude and/or posed in a sexually explicit position. Defendants' Motions should be DENIED as to Plaintiff's claim regarding Defendants' policy prohibiting the receipt through the mail of hardbound books.

## Background

Plaintiff John Heard has been imprisoned at Otero County Prison Facility ("OCPF") since July 24, 2013.  Plaintiff alleges that, while at OCPF, he personally was denied certain incoming mail—hardbound books and pictures—based on the mail policies of OCPF and the New Mexico Corrections Department ("NMCD").  [Doc. 1] at 14; [Doc. 9] at 1–2.

Plaintiff filed a complaint under 42 U.S.C. § 1983 on June 17, 2015 [Doc. 1], alleging that Defendants' policies violated his First Amendment rights.  Plaintiff named in his complaint Gregg Marcantel, NMCD Secretary of Corrections; James Frawner, former Warden of OCPF;

---

[3] *See* "Affidavit" [Doc. 63], "Statement in Support of Plaintiff's Position for Count 1" [Doc. 68], and additional untitled document [Doc. 69].

[4] *See* Defendant Marcantel's Response to "Affidavit of John Heard" [Doc. 66]; *see also* MTC Defendants' Response to Plaintiff's Pleading Entitled "Affidavit by John Heard" [Doc. 67]; Response to Plaintiff's Pleadings [Doc. 71].

and MTC, the private corporation that operates OCPF.  *Id.* at 1–3.  On September 2, 2015, Plaintiff filed a "Clarification on Original Complaint" [Doc. 9], which I have construed as a supplement to the complaint, *see* [Doc. 10] at 2.  Defendant Marcantel answered Plaintiff's complaint on November 24, 2015.  [Doc. 19].  Defendants Frawner and MTC filed their answer on December 22, 2015.  [Doc. 23].  On February 25, 2016, I ordered Defendants to submit a *Martinez* Report.  [Doc. 30].  Defendants Frawner and MTC submitted their *Martinez* Report [Doc. 38] on April 25, 2016; the same day, they filed a Motion for Summary Judgment [Doc. 39].  Defendant Marcantel submitted his *Martinez* Report [Doc. 42] on May 9, 2016.  Plaintiff filed his Motion to Amend Complaint [Doc. 43][5] and Motion to Stay Summary Judgment [Doc. 44][6] on May 26, 2016.  The parties' voluminous subsequent filings already have been set out *supra.*

## Summary Judgment Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant must support its request by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).

---

[5] I decline at this stage to rule on Plaintiff's Motion to Amend Complaint [Doc. 43] because the outcome of Plaintiff's motion does not impact my decision on summary judgment here.
[6] I address this motion in a separate order filed herewith.

The movant has the initial burden of establishing that no material facts are in dispute or that, taking all facts in the light most favorable to the non-moving party, the movant is entitled to judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992). Although all facts are construed in favor of the non-movant, the non-movant still has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

I liberally construe Plaintiff's filings because he is appearing pro se. Still, a pro se non-movant must "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013).

In a suit brought by a pro se prisoner, a court may order the defendants to investigate the plaintiff's claims and submit a report of that investigation, called a *Martinez* Report. *See Hall*, 935 F.2d at 1109; *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978). A court may use the *Martinez* Report to grant summary judgment upon motion of the defendants. *Hall*, 935 F.2d at 1009–13; *see also Celotex*, 477 U.S. at 326 (courts possess the authority to enter summary

4

judgment sua sponte, so long as the losing party is on notice that she must come forward with all her evidence).

## Analysis

Plaintiff alleges that two of Defendants' policies are unconstitutional.  First, Plaintiff challenges the NMCD mail policy providing that "[h]ardbound books" "will be cause for rejection." [Doc. 38-2] at 4 (CD-151201(E)(6)(e)).  Second, Plaintiff challenges the NMCD mail policy providing that "[p]ublications containing photographs of female(s) partially or totally nude and/or posed in a sexually explicit position" "will be cause for rejection." *Id.*

### Defendant Marcantel's Qualified Immunity Defense

Defendant Marcantel asserts that he is entitled to qualified immunity, "which provides a complete defense for government officials in 'the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" [Doc. 42] at 7 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993)).  Plaintiff's complaint, however, sought injunctive and declaratory relief from Defendants, not damages. [Doc. 1] at 5.  Qualified immunity is not available as a defense in a § 1983 action "where injunctive relief is sought instead of or in addition to damages." *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998)).  Because Plaintiff seeks injunctive and declaratory relief,[7] Defendant Marcantel's qualified immunity defense is inapposite, and I need not consider it further.

---

[7] In his Motion to Amend Complaint [Doc. 43], Plaintiff seeks additional relief in the form of damages against Defendants. *Id.* at 2.  I decline at this time to rule on the motion because it does not alter my analysis on summary judgment here.

**Section 1983 Personal Involvement**

MTC Defendants claim that Plaintiff has failed to allege their personal involvement in violating his constitutional rights, as required under § 1983.   [Doc. 39] at 6.   Section 1983 provides a cause of action for plaintiffs against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  To bring an action under § 1983, a plaintiff must allege the personal involvement of each defendant, showing that each, through his or her own actions, violated the Constitution.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  "Supervisory status alone does not create § 1983 liability." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)).   Supervisors and entities are liable "only for their own unconstitutional or illegal policies, and not for the employees' tortious acts."  *Pena v. Greffet*, 922 F. Supp. 2d 1187, 1242-43 (D.N.M. 2013) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

In the Tenth Circuit, a supervisor may be liable under § 1983 where the plaintiff shows that the supervisor "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which" deprives the plaintiff of his or her constitutional right.  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  A plaintiff must show an "'affirmative' link" between the unconstitutional action taken by the supervisor's

6

subordinates and the defendant-supervisor's "'adoption of any plan or policy . . . —express or otherwise—showing their authorization or approval of such misconduct.'"  *Id.* at 1200–01 (quoting *Rizzo v. Goode*, 423 U.S. 362, 371 (1976)).

Plaintiff does not assert that Defendants themselves intercepted his mail in violation of the Constitution; rather, he asserts that Defendants are responsible for promulgating and implementing the policies by which staff at OCPF filtered and rejected his mail.  The "personal involvement" requirement is satisfied because the alleged constitutional harms Plaintiff suffered stem directly from the policies adopted and implemented by Defendants.

### Constitutionality of Defendants' Mail Policies

At OCPF, prisoners may obtain certain publications and other materials through the mail, as well as through other channels.  NMCD policy regulates the types of materials that inmates may acquire through the mail and the means through which inmates may access or possess reading materials; overlaying the policies set out by NMCD, OCPF also regulates inmates' access to publications and other materials.  *See* [Docs. 38-2 to 38-11].

In general, NMCD policy provides that "inmates may acquire books, magazines, and newspapers from the publisher, not to exceed the allowable quantity as per institutional custody limitation."  [Doc. 38-5] at 6 (CD-150201(F)(4)).  "Books and magazines will be accepted and delivered to inmates if they are received directly from the publisher or vendor, subject to other restrictions set out herein and in other policies."  *Id.* at 2–3 (CD-151201(J)).  NMCD mail policies impose restrictions on inmates' access to reading materials.  The policies prohibit the receipt through the mail of hardbound books.  [Doc. 38-2] at 4 (CD-151201(E)(6)(e)).  NMCD

policies also impose certain content restrictions on material that may be received through the

mail.  Several such provisions are pertinent to this case.[8]  Mail will be rejected if "[t]he material

is obscene in that it appeals primarily to the prurient interests or is patently offensive."  *Id.* at 3–4

(CD-151201(E)(6)(c)).    Additionally,  "[p]ublications  containing  photographs  of  female(s)

partially or totally nude and/or posed in a sexually explicit position" will be intercepted.  *Id.* at 4

(CD-151201(E)(6)(e)).  A subsection of the mail policy clarifies that "[p]hotographs will be

rejected  only  pursuant  to  the  same  standards  and  procedures  as  publications."    *Id.*  at  5

(CD-151201(F)(3)).  Finally, NMCD policy on inmates' acquisition of property specifies that

"nudity" and "pornography" are prohibited.  [Doc. 38-5] at 6 (CD-150201(F)(4)).

> Written OCPF policy permits inmates to order and receive paperback books through the

mail "if they make advance arrangements with [the warden] and the paperback books are

purchased through the publisher or vendor."  [Doc. 38-1] at 2.  OCPF does not limit the "quantity

of correspondence a detainee may receive or send."    [Doc. 38-10] at 1 (OCPF Chapter 7

§ 707(A)).  OCPF's mail policies also impose content restrictions on the receipt of materials

through the mail.  "Correspondence and publications" may be rejected if they include, among

other things, "[s]exually explicit material."[9]  [Doc. 38-8] at 4 (OCPF Chapter 7 § 707(G)).  The

provision notes that, "if unsure the material is sexually explicit, the Warden will make the

---

[8] NMCD regulations impose other content restrictions—not at issue in this case—on inmates' receipt and acquisition of materials.  Among other things, the regulations restrict the receipt of material that "contains escape plans or other plans involving the inmate in the commission of a crime," "contain[s] instruction on the manufacture of drugs, tattoos, weapons, or explosives," or "promote[s], or depict[s] as favorable, gang activity."  *See* [Doc. 38-2] at 3–4 (CD-151201(E)(6)(a), (e)).

[9] Like NMCD, OCPF policies impose other content restrictions, including, for example, materials containing "escape plots [or] plans to commit illegal activities," "[t]hreats, extortion, . . . or gratuitous profanity," or "[a] code" of communication.  [Doc. 38-8] at 3–4 (OCPF Chapter 7 § 707(G)).

8

determination." *Id.*   OCPF policy also prohibits the receipt of "[c]orrespondence and publications" containing "obscenity." *Id.*

Inmates at OCPF also have access to books and other publications through alternative means other than the mail.  Inmates may access reading materials, including hardbound books, through OCPF's library.  [Doc. 1] at 7; [Doc. 38-1] at 2.  Plaintiff himself states that inmates have access to publications, including hardbound books, in the library and, at one point, were permitted to check out hardbound books.[10]  [Doc. 1] at 7–8.  Plaintiff also notes that inmates may receive materials, including hardbound books, through an inter-library loan program.  *Id.* Plaintiff further describes a system, which he states is no longer in effect and which Defendants do not address, whereby inmates have been permitted to purchase hardbound books through a vendor, donate the books to the library, and then check out the books.[11]  [Doc. 27] at 4–5. Finally, Plaintiff has also described a policy at OCPF whereby inmates are permitted to keep hardbound books they order through the mail if they remove the hard covers.  *Id.* at 5. Curiously, Defendants make no reference to this policy; because Defendants do not dispute its existence and because I take undisputed facts as true on summary judgment, I assume the policy is operative.

Prisoners are entitled to the protections of the Constitution.  *Turner v. Safley*, 482 U.S. 78, 84 (1987).  Among these protections is the First Amendment right of a prisoner to correspond with others outside the prison.  *See id.* at 93 (evaluating prison regulation restricting

---

[10] In his complaint, Plaintiff stated that inmates could check out hardbound books from the library and represented that he personally had done so.  [Doc. 1] at 7–8.  In a subsequent filing, Plaintiff states that inmates at OCPF may view, but no longer are permitted to check out, hardbound books.  [Doc. 45] at 3–4.

[11] Plaintiff described this policy in a January 19, 2016, filing.  [Doc. 27] at 4–5.  In a subsequent filing, Plaintiff states that OCPF no longer permits inmates to obtain hardbound books though the method described.  [Doc. 45] at 3.

correspondence between inmates at different prison facilities); *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (considering prisoner's claims under the First Amendment, "in particular his right to communicate with persons outside the prison").  Inmates have a right "to receive information while in prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004).  These rights, however, may be cabined by corrections policies implemented in the interests of safety and security.  *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989).  Indeed, "[p]risoners' rights may be restricted in ways that 'would raise grave First Amendment concerns outside the prison context.'"  *Gee*, 627 F.3d at 1187 (quoting *Thornburgh*, 490 U.S. at 407).  In evaluating the constitutionality of a prison regulation that "'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'"[12]  *Id.* (quoting *Turner*, 482 U.S. at 89).

The Supreme Court in *Turner* set out four factors to be used to evaluate the reasonableness of a prison regulation that infringes on constitutionally protected rights.  482 U.S. at 89–90.  First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."  *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).  The regulation at issue must not be "arbitrary" or "irrational."  *Id.* at 90.  Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates."  *Id.*  Third, courts must weigh "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id.*  Where accommodating the asserted

---

[12] Plaintiff cites to and quotes from numerous cases, without context or argument, urging the Court to rely on the legal principles stated therein.  *See* [Doc. 1]; [Doc. 27]; [Doc. 46].  I have considered the cases Plaintiff cites, and I find that they are not persuasive and do not control here.

right will strain the prison's resources or have some other "significant 'ripple effect,'" courts should be particularly deferential to the discretion of prison officials. *Id.* Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* (citing *Block*, 468 U.S. at 587). However, prison regulations need not satisfy the stringent "least restrictive alternative" test and courts need not consider "every conceivable alternative method"; rather, the court should consider whether "obvious, easy alternatives" exist that would accommodate the right "at *de minimis* cost to valid penological interests." *Id.* at 90–91 (internal quotations omitted).

A *Turner* analysis "requires close examination of the facts." *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007). Courts must consider the facts "on a case-by-case basis" to determine whether a prison regulation's impingement on an inmate's First Amendment rights is justified. *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002). While defendants must set forth a legitimate penological interest reasonably related to the regulation at issue, the plaintiff prisoner bears the ultimate burden of disproving the validity of the regulations. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden rests on the plaintiff "to set forth 'specific facts' that, in light of the deference that courts must show to the prison officials, could warrant a determination" in the prisoner's favor. *Beard v. Banks*, 548 U.S. 521, 525 (2006) (quoting Fed. R. Civ. P. 56(e); *Overton*, 539 U.S. at 132).

Courts must be mindful of the "institutional objectives" served by the regulations at issue and the "measure of judicial deference owed" to prison officials in their implementation of such objectives. *Pell v. Procunier*, 417 U.S. 817, 827 (1974); *see also Beard*, 548 U.S. at 528

("[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'" (quoting *Overton*, 539 U.S. at 132)).  The *Turner* standard "is necessary if 'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'"  *Turner*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)).  On summary judgment, the plaintiff must do more than just "disagree with the views expressed" by prison officials in affidavits; rather, the prisoner "must point to evidence creating genuine factual disputes that undermine those views."  *Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006).  Courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment," the latter of which requires judicial deference.  *Beard*, 548 U.S. at 530.

**Hardbound Books**

Plaintiff argues that NMCD policy CD-151201(E)(6)(e), prohibiting receipt through the mail of hardbound books, is an unconstitutional violation of his First Amendment rights.  He does not state which specific book title(s) he has been denied, alleging only that he "personally [has] had a hard cover book denied while at [OCPF]."  [Doc. 9] at 1.  Defendants do not deny that their policy prohibits inmates from receiving hardbound books through the mail.

Turning to the first *Turner* factor, whether there is a rational connection between the policy and the asserted governmental interest, Defendants assert that the ban on hardbound books through the mail is rooted in safety and security concerns.  In his affidavit, OCPF Warden Martinez stated that the policy was prompted by concerns that contraband could be concealed in the books.  [Doc. 38-1] at 2.  He also stated in his affidavit that restricting the total number of

hardbound books coming into the prison from outside sources "reduces the time and resources necessary to inspect and search" inmates' property. *Id.* It also "lessens the administrative burden on OCPF personnel who must inspect each book." *Id.* at 3. Similarly, Jerry Roark, Director of the Adult Prisons Division of NMCD, stated in his affidavit that the regulation arose out of concerns that hardcover books could be used to smuggle contraband into prison facilities and to circulate contraband within the facilities. [Doc. 42-2] at 28. Mr. Roark further testified that hardcover books "may also be fashioned into weapons." *Id.*

Courts have found that safety and security are legitimate penological interests and that hardbound books may create safety and security problems. The Supreme Court has upheld a jail's regulation limiting inmates' acquisition of hardbound books to those mailed directly from a publisher, bookstore, or book club. *Bell v. Wolfish*, 441 U.S. 520, 549–50 (1979) (hardbound books create "an obvious security problem" and are "serviceable for smuggling contraband into an institution"). In upholding the regulation, the Court distinguished between books coming into the jail directly from publishers or vendors and books coming in from other outside sources, noting that "there is relatively little risk" that the former would contain contraband. *Id.* at 549. The Tenth Circuit Court of Appeals has extended the reasoning of *Bell* to uphold a county jail's prohibition on books (hardbound and paperback) received from outside the institution, given that the institution had a safety and security interest in regulating incoming materials. *Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1156–57 (10th Cir. 2007); *see also Pfeil v. Lampert*, 603 F. App'x 665, 669 (10th Cir. 2015) (hardbound books may be used "for hiding contraband or weapons and . . . themselves can be used as weapons").

13

Plaintiff argues that the facility's restriction on the *means* by which an inmate may receive hardbound books, rather than the possession of the hardbound books themselves, belies Defendants' asserted safety and security rationale.  *See* [Doc. 1] at 8–10; [Doc. 45] at 2–4. Plaintiff describes the various other avenues through which inmates at OCPF in the past have been permitted to acquire hardbound books (through the library and inter-library loan), and he states that he himself has multiple hardbound books stored in his cell.  *Id.*  If NMCD and OCPF actually believed that hardbound books threaten the safety of guards and inmates and the security of the prison facility, he asserts, then why do the regulations permit inmates to access them in the library or keep them in their cells?

Still, courts must defer to the professional judgment of prison officials, *Beard*, 548 U.S. at 530, and Plaintiff here questions the professional wisdom of distinguishing between hardbound books from outside sources (even if those sources are merely book publishers and vendors) and those from sources with facility oversight, like the library.  Plaintiff asks the Court to impose a more stringent standard in evaluating Defendants' asserted penological interests than *Turner* instructs.  Plaintiff asks for an airtight, narrowly tailored policy; in deference to the expertise of prison administrators, *Turner* requires courts to evaluate only whether the policy bears a rational relationship to the government interest.  Though Defendants' asserted justifications for the regulation are diluted by the apparent access to some hardbound books that inmates at OCPF have enjoyed, the hardbound book policy is rationally related to the asserted penological interests.

14

*Turner* next instructs courts to evaluate the alternative means, if any, by which the prisoner may exercise the burdened right.  482 U.S. at 90.  The second *Turner* factor is satisfied where the regulatory scheme "permit[s] a broad range of publications to be sent, received, and read."  *Thornburgh*, 490 U.S. at 418.  "[A]lternatives need not be ideal; they need only be available."  *Jones*, 503 F.3d at 1153.  In *Jones*, the jail policy prohibiting inmates from ordering books from outside the facility was buttressed by an unwritten but active policy allowing inmates to order paperback books directly from a publisher with approval from jail staff; a public donation process through the bookseller Barnes & Noble permitting donations to specific prisoners through the jail's library; and a library containing "thousands of books" and from which prisoners could make specific requests.  *Id.* at 1156–57.

The breadth of alternative sources of reading materials to which Plaintiff has access is a matter of some factual dispute.  The parties agree that prisoners at OCPF have access to books and other reading materials through the library and through an inter-library loan system through which prisoners apparently can request specific materials.  [Doc. 1] at 7–8; [Doc. 38-1] at 2.  The size of the prison library and the contours of the inter-library loan program, however, are not alleged; Plaintiff does not challenge the adequacy of the library facilities and Defendants offer no specific information as to the number of volumes at the library or the reach of the inter-library loan system.  Plaintiff's revelation that he acquired through inter-library loan two of the three specific paperback books he sought, relating to raising rabbits and angora wool farming, does point to an effective, potentially robust, library system.  *See* [Doc. 68] at 5.

Defendants contend that, beyond the library, prisoners may receive paperback books (along with newspapers and magazines) through the mail so long as they are ordered directly from a publisher or approved vendor, subject to the approval of the warden.  [Doc. 38-1] at 3. MTC Defendants identified the two (and there are only two) approved vendors from which inmates may purchase paperbacks:  Edward R. Hamilton Booksellers, offering by Defendants' count approximately 20,000 paperback books, and Christian Book Distributors, offering more than 100,000 paperback books, many but not all of which relate to Christian themes. [Doc. 67] at 4–5.  MTC Defendants also state that prisoners may order paperback books directly from the publisher, subject to the warden's pre-approval.  [Doc. 38-1] at 1–2; [Doc. 67] at 2. Plaintiff contends, to the contrary, that he is effectively unable to receive any book from a publisher, whether hardbound or paperback.  He describes three separate instances in which he sought pre-approval to place orders for paperback books from a publisher, but none was approved.[13]  [Doc. 63] at 1–2; [Doc. 68] at 5–6; [Doc. 69] at 1.  Plaintiff states that "the warden *will not* approve *any* book from a publisher."  [Doc. 68] at 6 (emphasis in original).  Taking all disputed facts in the light most favorable to the non-moving party on summary judgment, I assume for the purposes of this analysis that Plaintiff is unable to acquire paperback books (or hardbound books) from publishers.

Defendants cite to *Jones* for the constitutionality of the so-called "publisher only" rules limiting incoming reading materials to softcover materials ordered directly from a publisher or bookseller, in the Tenth Circuit and in other circuits.  [Doc. 39] at 8; 503 F.3d at 1158–59.  The

---

[13] As discussed *infra*, Plaintiff's claims regarding his inability to purchase paperback books directly from the publisher are unripe for review.  I bring the claims up at this juncture because they inform my consideration of Plaintiff's alternatives to hardbound books.

restrictions working against Plaintiff in this case are more pervasive.  Plaintiff's access to books

is restricted to two vendors offering a limited quantity of publications and a library system of

unknown reach.  Defendants do not point to any case in which the Tenth Circuit has upheld such

a restriction, and my review has found none.  In cases where the Tenth Circuit and the Supreme

Court have upheld more restrictive practices on the receipt of publications, the corrections

facilities in question asserted more specialized government interests.  *See Beard*, 548 U.S.

at 2575–76 (upholding a prison policy that denied access to newspapers, magazines, and

photographs, and limited to two library books, but only as to prisoners in a long-term segregation

unit deemed to be "specially dangerous and recalcitrant"); *Grissom v. Werholtz*, 524 F. App'x

467, 471–72 (10th Cir. 2013) (upholding regulation prohibiting inmates in administrative

segregation from subscribing to magazines and limiting inmate's access to publications to those

in the prison library, where the inmate had a history of possessing dangerous contraband).

Nor have I found an analogous case from another circuit upholding prison regulations

more restrictive than a "publisher only" rule.  Some circuits have, like the Tenth Circuit,

extended *Bell v. Wolfish* to uphold a publisher-only rule for softcover books only.  *E.g.,*

*Thompson v. Campbell*, 81 F. App'x 563, 569 (6th Cir. 2003) (noting that the Sixth Circuit

permits a softcover "publishers only" rule); *Williams v. Hurd*, 755 F.2d 306, 307–09 (3d Cir.

1985) (upholding a publisher-only rule for softcover books, but expressing "concern about what

may be the prison's overreaction to its undeniably real security problem").  Other circuits have

suggested that *Bell* itself set out the outer limit on prohibitions of publications justified by a

safety and security rationale.  *See Jackson v. Elrod*, 881 F.2d 441, 445–46 (7th Cir. 1989)

(denying qualified immunity on county jail's softcover "publishers only" rule and recognizing that the "wholesale prohibition of hard-bound books" without an exception for publishers was not constitutional) (internal quotation marks and ellipsis omitted); *see also Keenan v. Hall*, 83 F.3d 1083, 1093 (9th Cir. 1996) (noting that a ban broader than the one upheld in *Bell v. Wolfish* "might not survive challenge").

One circuit has upheld a total ban on the receipt of publications through the mail, whether or not submitted from a publisher; however, its decision was based on factors inapposite to this case. *See Hause v. Vaught*, 993 F.2d 1079, 1081 (4th Cir. 1993). Crucial to the Fourth Circuit's analysis was the fact that most detainees, including the plaintiff, were incarcerated at the facility in question for very brief periods of time and that, as a practical matter, most detainees would be transferred from the detention center before any mail order ever arrived. *Id.* at 1083. The Fourth Circuit upheld the ban, even though the jail library—the detainee's primary alternative means of accessing reading materials—was very limited. *Id.* at 1083–84. The factors that drove the Fourth Circuit's analysis in *Hause* are inapplicable here.

The third and fourth *Turner* factors do weigh in Defendants' favor. Warden Martinez averred that additional resources would have to be diverted toward inspecting and searching inmate property if hardbound books could be acquired through outside sources. [Doc. 38-1] at 2. And Plaintiff has offered no ready alternatives to the regulation that would come at de minimis cost.

A grant of summary judgment is appropriate only where the moving parties have shown that they are entitled to judgment as a matter of law, even taking the facts in the light most

favorable to the non-movant.  On consideration of the four *Turner* factors, I find that summary judgment is not appropriate at this stage.  Plaintiff has presented evidence challenging Defendants' representation that inmates at OCPF have robust access to books from outside the prison.  Plaintiff's alternate means of accessing books is an important component of the *Turner* analysis, and Defendants have failed to refute Plaintiff's assertion that he is effectively barred from obtaining books from a publisher from outside the prison.  If Defendants had provided evidence that Plaintiff is permitted to receive paperback books from publishers, the outcome may have been different.  Defendants also failed to provide evidence of the size and accessibility of the OCPF library and inter-library loan system; evidence of a voluminous library collection may have moved the second *Turner* factor in Defendants' favor.  Finally, Defendants have failed to cite any case showing that restricting the alternative means of access to books to this degree—a restriction which goes well beyond the paperback book publisher-only policy in *Jones*—is permissible.  Defendants are not entitled to summary judgment on this claim at this time.

### Pictures Displaying Nudity and Sexually Explicit Materials

Plaintiff also alleges the unconstitutionality of NMCD policy CD-151201(E)(6)(e), prohibiting receipt through the mail of "[p]ublications containing photographs of female(s) partially or totally nude and/or posed in a sexually explicit position."  [Doc. 1] at 4; [Doc. 9] at 2. Plaintiff argues that the policy is unconstitutional because it cannot be supported by any legitimate penological interest; is unconstitutionally vague, leaving prison officials with impermissibly wide latitude to reject incoming materials; and is not content neutral, because it references "females" only.  [Doc. 1] at 5–6, 10–11.

19

As with the ban on receipt of hardbound books through the mail, the *Turner* factors govern the permissibility of the NMCD and OCPF provisions under which Plaintiff's pictures were intercepted.  482 U.S. at 89–91.  Plaintiff argues that the Court should assess his First Amendment claims under a strict scrutiny framework.  [Doc. 44] at 1–2; [Doc. 50] at 7–8.  The Supreme Court, however, has explicitly rejected the strict scrutiny standard in assessing the constitutionality of prison regulations.  *Turner*, 482 U.S. at 81.  Rather, *Turner* provides that a prison regulation impinging on an inmate's constitutional right is permissible where it is "reasonably related to legitimate penological interests."  482 U.S. at 89.  Regulations need not be "narrowly drawn" or the "least restrictive means" of accomplishing the stated governmental interest to satisfy *Turner*.

As to the first *Turner* factor—whether the asserted governmental interest bears a "valid, rational connection" to the regulation at issue—Defendants have offered three rationales: protecting institutional security, discouraging sexual harassment among guards and inmates, and not impeding the prison's efforts to rehabilitate its sex offender population.  Warden Martinez stated in his affidavit that sexually explicit material "may inflame a prisoner, excite a prisoner, and perhaps result in the assault of another prisoner."  [Doc. 38-1] at 3.  He further stated that inmate access to such materials "increase[s] the potential for sexual harassment complaints" by prison staff, because staff may be forced to discharge their duties in an area where a prisoner has displayed sexually explicit images, prompting lewd comments from prisoners.  *Id.*  Warden Martinez further noted that permitting such images to enter the prison—where they have the potential to circulate among prisoners—may impede the rehabilitation of inmates who, like

20

Plaintiff, are sex offenders.  *Id.*  Because OCPF hosts a Sex Offender Treatment Program, sex offenders make up a significant portion of its population.  *Id.*  Defendant Marcantel echoed these justifications.  *See* [Docs. 42, 42-2].  In his affidavit, Mr. Roark noted that the specific policy in question was adopted to prevent episodes of sexual harassment stemming from inmates affixing images to their cell walls or otherwise displaying them.  [Doc. 42] at 4–5; [Doc. 42-2] at 26–27. He noted that the pictures had the potential to create a hostile working environment for corrections staff, and that their display could foster a "sexualized atmosphere" that would be counterproductive to NMCD's rehabilitation efforts with respect to sex offenders.  *Id.* at 26–27.

Restrictions on the ingress of sexually explicit materials into prison facilities are commonplace, and the Tenth Circuit has upheld such prohibitions.  *Jones*, 503 F.3d at 1155 (upholding jail provision prohibiting publications containing "any sort of sexually explicit material" under a safety and security rationale) (internal quotations omitted); *Sperry v. Werholtz*, 413 F. App'x 31, 39–40 (10th Cir. 2011) (upholding Kansas Department of Corrections regulation prohibiting possession of sexually explicit materials by inmates, where the regulation was implemented to maintain security at the state's facilities, to aid in the rehabilitation of incarcerated sex offenders, and to stymie sexual harassment).  In this District, the Honorable Kenneth Gonzales, United States District Judge, recently upheld under the *Turner* standard an obscenity regulation on which prison officials relied to deny Plaintiff a Sports Illustrated Swimsuit Edition magazine, which "contained images of individuals partially or totally nude and/or posed in sexually explicit positions."  *Heard v. Bravo*, [Doc. 110] at 5–7 in 13-cv-1236

KG/WPL (D.N.M.) (internal quotation marks omitted). The policies at issue in this case are rationally related to the legitimate penological interests asserted by Defendants.

Turning to the second *Turner* factor, while the policies at issue limit inmates' ability to receive certain discrete categories of materials, they leave inmates with broad access to an array of publications, and inmates remain free to correspond with others outside the facility. *See* [Doc. 38-5]. The content regulations here are narrow and do not impinge on inmates' access to most publications available through the mail and the library. *See id.* In fact, Plaintiff challenges the policy for restricting only publications with nude or sexually explicit depictions of "female(s)," rather than all individuals. [Doc. 1] at 10–11. Defendants represent that this policy language was included as a specific response to a safety and security problem they identified as having been caused by receipt and display of pictures of females specifically, not males. *See* [Doc. 42-2] at 26–27; [Doc. 64-2] at 1–2. The policy language was targeted and discrete, and it avoided potentially shuttering a broader class of publications from inmates.[14]

Defendants have pointed to the significant, serious potential consequences of permitting the prohibited materials to enter into the prison. The threat of sexual harassment and the other ills discussed *supra* tip the third *Turner* factor in favor of Defendants.

Finally, as to the fourth *Turner* factor, Defendants argue compellingly that no readily apparent alternatives exist that would not carry a hefty administrative burden. They note, for example, that simply prohibiting inmates from posting offensive materials on their cell walls

---

[14] Of course, even if the specific provision Plaintiff cites were not operative, other, related NMCD and OCPF regulations prohibit the receipt of materials that are obscene, sexually explicit, or contain nudity; these other provisions may have operated to prohibit the materials anyway. *See* [Doc. 38-2] at 3–5; [Doc. 38-5] at 6; [Doc. 38-8] at 4. Again, however, the umbrella of regulations prohibiting these materials is sufficiently narrow and does not wall off from inmates the vast majority of publications.

would require extra staff power to monitor and enforce, and its effectiveness in stopping the harms described would depend on inmates' cooperation.  *See* [Doc. 42] at 5; [Doc. 42-2] at 27.  Likewise, removing all objectionable materials from publications before permitting inmates to receive the publications would force the prison to divert significant additional resources to its mailroom staff.  *See* [Doc. 42-2] at 27–28.  Plaintiff asserts what he believes the policy *should* be.  *E.g.*, [Doc. 45] at 5–6.  However, the *Turner* standard does not invite plaintiffs to substitute their own judgment for the institutional knowledge of corrections officials.  *Beard*, 548 U.S. at 530.  Nor does it require that administratively burdensome alternatives be considered or pursued; the absence of a readily available alternative is evidence of a regulation's reasonableness.  482 U.S. at 90–91.

Plaintiff also argues that the regulation is unconstitutionally vague.  [Doc. 1] at 5–6.  He argues that the mail regulation lacks a narrowly drawn set of standards and leaves open to prison officials' discretion and "personal opinions and prejudices" the types of materials that may be excluded.  *Id.*  Plaintiff's chief argument in support of this allegation is that he was denied a color photograph under these regulations on one occasion, but several months later was permitted to receive a monochrome version of the same photograph.  [Doc. 1] at 14–15.  MTC Defendants state they have no evidence that a color picture was rejected and no evidence that a similar black-and-white picture was received by Plaintiff.  [Doc. 39] at 9.  For the purposes of summary judgment, I assume that Plaintiff's factual claims on this point are true.

That Plaintiff received a black-and-white version of a picture but was denied a color version of the same picture, however, is immaterial to my consideration of this argument; it does

not evidence a constitutional violation.  Analysis of the constitutionality of a prison regulation—inclusive of any inquiry into the specificity of the policy language—is governed by the *Turner* standard.  *Jones*, 503 F.3d at 1155–56 (rejecting party's reliance on non-prison First Amendment cases about the vagueness doctrine and analyzing jail policies instead under *Turner*).  As set out in detail above, the policy in question satisfies the *Turner* standard.  *See id.* (holding that policy language limiting the receipt of publications to those that are "consistent with Jail security concerns" and prohibiting "sexually explicit material"—without further written explanation or definition in the policies themselves—was not impermissible under *Turner*).  The regulation at issue in this case affords prison officials the appropriate latitude to discharge their duties in a manner that protects the prison's legitimate penological interests.

Finally, Plaintiff claims that the NMCD policy prohibiting publications containing photographs of female(s) nude or posed in a sexually explicit position is not content neutral because it references "females" only.  [Doc. 1] at 10–11.  As an initial matter, it is not clear that the pictures Plaintiff claims were intercepted would have been delivered to him absent this provision.  Indeed, several NMCD and OCPF provisions together ban nudity, obscenity, and sexually explicit materials.  *See* [Docs. 38-2, 38-5, 38-8].

Even assuming that the pictures were rejected under this policy and otherwise would have been delivered to Plaintiff, their interception was not unconstitutional.  Again, analysis of the constitutionality of a prison regulation—including a regulation on content—is conducted using the *Turner* standard.  *Thornburgh*, 490 U.S. at 415.  As the Supreme Court explained in *Thornburgh*, the Court's use of the term "neutrality" in *Turner* refers to the government's

penological interest, which must be "unrelated to the suppression of expression." *Id.* (internal quotations omitted).  In other words, a prison regulation is "neutral" for purposes of a *Turner* analysis when the government's rationale behind the regulation is unrelated to content—when the asserted government interest is prison security or safety, for example.  *Id.* at 415–16 (holding that a regulation is "neutral" in the *Turner* sense where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security").  Indeed, correctional facilities frequently impose content-based restrictions:  prohibitions on obscenity, sexually explicit materials, materials that instruct on the manufacture of contraband, and/or materials relating to escape plans, for example, all restrict on the basis of content.  *See, e.g., id.* at 404 (prohibitions on materials that "might facilitate criminal activity"); *Jones*, 503 F.3d at 1155 (prohibition on "technical publications" and "any sort of sexually explicit material"); *Ind v. Wright*, 52 F. App'x 434, 436 (10th Cir. 2002) (prohibition on reading materials that "encourage or endorse[] violence or disorder").  Though "non-neutral" in the sense that they regulate on the basis of content, these and other content restrictions are analyzed under the *Turner* standard such that the neutrality test applies to a consideration of the underlying governmental purpose behind the restriction.  As set out in detail above, the policy in question was enacted to address specific safety and security concerns; it stands under *Turner* and is not unconstitutional.

Plaintiff's claim presents no genuine issue of material fact.  Considering the evidence and taking all reasonable inferences in the light most favorable to Plaintiff, no reasonable juror could find that NMCD policy CD-151201(E)(6)(e), prohibiting the receipt through the mail of

"[p]ublications containing photographs of female(s) partially or totally nude and/or posed in a sexually explicit position," is not reasonably related to Defendants' interests in prohibiting sexual harassment and promoting rehabilitation.  Defendants are entitled to judgment as a matter of law on this claim.[15]

### Plaintiff's Additional Claims

In several filings entered subsequent to Plaintiff's complaint and amended complaint, Plaintiff alleges additional injuries at the hands of Defendants.  *See* [Docs. 47, 63, 68, 69].  To the extent I could construe these additional allegations as motions to amend the complaint, I decline to do so because it would be futile.  I consider each of the allegations briefly below.

### Access to the Photocopier

Plaintiff alleges that the OCPF librarian, Ms. Azua, denied his requests on two occasions to have certain images photocopied to be used as evidence in this case.  He claims that on April 29, 2016, he attempted to make copies of photographs from "Flex," a publication he apparently had access to through the library.  [Doc. 47] at 1–2.  He also claims that, several days later, he attempted to make copies of fifteen pictures that were in his personal possession.  *Id.* at 2–3.  He suggests that the copies are pertinent to his claim regarding the prohibition on nude

---

[15] Plaintiff has filed in this case a Motion to Stay Summary Judgment [Doc. 44].  The relief Plaintiff requests therein would not alter my decision on summary judgment as to this claim.  Plaintiff's motion is addressed in a separate order filed herewith.  Plaintiff has also filed a Motion to Amend Complaint [Doc. 43].  I decline to rule at this stage on Plaintiff's motion.  Even if I were to rule on the motion, it would not alter my finding of summary judgment for Defendants on Plaintiff's second claim, relating to the prohibition on nudity and sexually explicit materials.  Plaintiff seeks to add the following parties to the lawsuit:  Warden Martinez, the current warden of OCPF; Ms. Azua, MTC librarian; Ms. Maurino, OCPF mailroom supervisor; and any "unknown person" who "sets policy, writes regulations, or is otherwise responsible for policy."  [Doc. 43] at 1–2.  Plaintiff also seeks to add claims for damages against the existing Defendants.  *Id.* at 2.  The addition of any of these parties or claims would not change the facts on this claim and would not alter my consideration of the constitutionality of Defendants' policy on sexually explicit and nude materials; therefore, the grant of summary judgment in favor of Defendants would stand irrespective of any ruling on Plaintiff's Motion to Amend Complaint.

or sexually explicit depictions of females because the images show that the policy does not apply to depictions of males and is not consistently applied. *Id.* at 2, 3–4.

"The constitutional concept of an inmate's right of access to the courts does not require that prison officials provide inmates free or unlimited access to photocopying machinery." *Johnson v. Parke*, 642 F.2d 377, 380 (10th Cir. 1981) (citing *Harrell v. Keohane*, 621 F.2d 1059 (10th Cir. 1980)). However, allowing photocopy access where photocopies are required may be part of the "meaningful access to the courts" to which inmates are entitled. *Id.* (internal quotations omitted). A plaintiff must show that he has a "meaningful legal need" for photocopies to state a meritorious claim. *Muhammad v. Collins*, 241 F. App'x 498, 499 (10th Cir. 2007). "When an inmate's access to the courts is not unduly hampered by the denial of access to such machinery, he cannot complain." *Johnson*, 642 F.2d at 380.

Even if Plaintiff had been denied access to the photocopier on the two occasions he alleges, the denial would not have unduly hampered his constitutional right of access to the courts because Plaintiff was not harmed by his inability to provide the photocopies in question to the Court. As to the first set of pictures (those from "Flex" depicting images of males), their factual existence is not in dispute because Defendants do not contest that such publication is available in the prison's library and depicts partially nude males. As to the second set of pictures (those in Plaintiff's possession), my analysis of the regulation in question, set out *supra*, does not depend on what materials Plaintiff has received through the mail or whether certain pictures were received inconsistently with the mail policy. Even if I were to assume that Plaintiff received through the mail the pictures he claims to have received, the result would not differ. The fact

that Plaintiff seeks to support through the copies is not material to my findings, and Plaintiff was not harmed by his inability to submit photocopies of the pictures in question.  To the extent I could construe these claims as motions to amend the complaint, I decline to do so because it would be futile.

### Access to Paperback Books

Plaintiff also alleges that he has not been able to order any paperback books from publishers.  [Doc. 63] at 1–2; [Doc. 68] at 5; [Doc. 69] at 1.  Plaintiff states that he sought pre-approval to order paperback books directly through a publisher, as required by OCPF policy, and his request was denied.  [Doc. 63] at 1–2.  Plaintiff himself states that the denial "is currently in the grievance process."  *Id.* at 1.  In two subsequent filings, Plaintiff states that he has made additional requests for other paperback books and that the requests are pending.  [Doc. 68] at 5; [Doc. 69] at 1.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), provides that prisoners may not bring a § 1983 claim "until such administrative remedies as are available are exhausted."  *See Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (holding that a prisoner who has initiated but not yet completed the grievance process has not exhausted his administrative remedies and cannot bring a § 1983 claim).  Additionally, "'[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all.'"  *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir. 2016) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

28

Plaintiff failed to exhaust his administrative remedies with respect to the alleged denial of a paperback book order that was still in the grievance process when Plaintiff entered the filing. The remaining claims regarding paperback book orders, which had been neither approved nor rejected at the time of Plaintiff's filing, are unripe.  To the extent the Court could construe these claims as motions to amend the complaint, it declines to do so because it would be futile.

**Warden Martinez's Affidavit**

Finally, Plaintiff challenges Warden Martinez's representation, in his affidavit, of the process by which inmates may obtain paperback books, and Plaintiff requests that the Court take a number of actions with respect to Warden Martinez and the affidavit.  [Doc. 63] at 11–12. Plaintiff asks that the affidavit be "stricken from the court record"; that Warden Martinez be declared an "uncredibale [sic] witness"; that the Court deny "all future statements" from Warden Martinez; and that the Court proceed with perjury charges against Warden Martinez.  *Id.* at 12. In turn, Defendants MTC and Frawner request that the Court "admonish Plaintiff from filing" any further statements "for purposes of airing irrelevant, unripe complaints, and harassing Warden Martinez" and ask for additional relief.  [Doc. 71] at 1, 5.  The requests by Plaintiff and Defendants are frivolous, and I decline to take any such action.

<u>Conclusions and Recommended Disposition</u>

For the reasons set forth herein, I recommend that Defendants' Motions [Docs. 39, 42] be **GRANTED IN PART** and **DENIED IN PART**.  I recommend that Defendants' Motions be **GRANTED** as to Plaintiff's claim regarding Defendants' policy prohibiting the receipt through the mail of publications containing photographs of female(s) partially or totally nude and/or

posed in a sexually explicit position. I recommend that Defendants' Motions be **DENIED** as to Plaintiff's claim regarding Defendants' policy prohibiting the receipt through the mail of hardbound books.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.** *See* **D.N.M.LR-Civ. 10.1. Objections are limited to 25 pages, inclusive of any amended filings. If no objections are filed, no appellate review will be allowed.**

_____

**STEPHAN M. VIDMAR**
**United States Magistrate Judge**